UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

JOHN ROBERTSON,

Plaintiff,

- against -

AMTRAK/NATIONAL RAILROAD PASSENGER CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

**OPINION**

04 Civ. 6033 (DC)

**APPEARANCES:** LOCKS LAW FIRM
Attorneys for Plaintiff
By: Fran L. Rudich, Esq.
110 East 55th Street
New York, NY 10022

LANDMAN CORSI BALLAINE & FORD P.C.
Attorneys for Defendant
By: Jennifer Hein, Esq.
120 Broadway, 27th Floor
New York, NY 10271

**CHIN, D.J.**

Plaintiff John Robertson sues his current employer National Railroad Passenger Corporation ("Amtrak") for unlawful discrimination because of his mental illness, including bipolar disorder, chronic depression, and drug and alcohol dependence. Robertson brings claims under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), and the New York State and City Human Rights Laws (respectively, the "NYSHRL" and the "NYCHRL"). Amtrak moves for summary judgment on all claims.

On the record before the Court, a reasonable jury could only find that, far from discriminating against him, Amtrak gave Robertson every opportunity to improve his work performance and to explain his repeated, excessive absenteeism. Indeed, after a decade-long history of absenteeism and disciplinary problems in a position that involved responsibility for the safety of Amtrak employees and customers, Robertson simply failed to show up for work for more than four months -- without authorization or any medical documentation. Although a hearing officer later found, following disciplinary hearings, that Robertson had 106 days of unexplained absences and was guilty of insubordination, Amtrak gave Robertson yet another chance and re-hired him. Under these circumstances, no reasonable jury could find that Amtrak discriminated against Robertson. Amtrak's motion for summary judgment is granted, and Robertson's claims are dismissed.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to Robertson, the facts are as follows:

Robertson was hired by Amtrak as a train conductor in the 1980s. (Hein Decl. Ex. E, Tab 1; Robertson Aff. ¶ 2).[1] At all relevant times he has been subject to the terms and

[1] In his affidavit in opposition to summary judgment, Robertson states that he was hired in December 1989. (Robertson Aff. ¶ 2). Amtrak, however, has submitted a "Personnel Action Request" form indicating that Robertson was hired in 1983. (Hein Decl. Ex. E, Tab 1). For purposes of this motion the difference is immaterial.

conditions of a collective bargaining agreement (the "CBA") between his union, United Transportation Union (the "Union"), and Amtrak. (Hein Decl. Ex. D, Tab 1). The job posting for train conductors provides that conductors are

> responsible for the safe movement of trains and passengers; for the protection of trains, the handling of hand-thrown switches; the coupling and uncoupling of cars and locomotives and the display of proper train signals. The Passenger Conductor will assist passengers in loading and detraining at station stops, collect fares, tickets or passes from their passengers; announces train stops. Will be responsible for handling of baggage, on and off the train for passengers and in the baggage car. Complete required Amtrak forms to report problems with equipment, incidents on board train, ticket revenue information, accidents, injuries and death.

(Id. Ex. E, Tab 1).

Robertson has a long track record of disciplinary problems, going back to the early nineties. (Id. Ex. D, Tab 2 & Ex. E, Tab 3). Specifically:

- In February of 1990, Robertson was disciplined for theft of company property. (Id. Ex. E, Tab 3).
- In June of 1990, Robertson was disciplined for failing to account for eighty-seven cash fares. (Id.).
- In September of 1991, Robertson received a letter of warning for excessive absenteeism. (Id.).
- In October of 1992, Robertson tested positive for cocaine, but was allowed to return to work after retesting negative and agreeing to be tested quarterly. (Id.).
- In April of 1993, Robertson received verbal counseling for excessive absenteeism. (Id.).
- In July of 1993, Robertson received a thirty-day suspension for improperly supervising an engineer who

failed to stop at a stop signal. (Id.).

- In July 1994, Robertson was the subject of a formal investigation and suspended for five days for his involvement in the "rough coupling" of train cars that "resulted in reported injuries to employees." (Id.).
- In August 1994, Robertson received a written warning for excessive absenteeism. (Id.).
- In March 1995, Robertson again received verbal counseling, again for excessive absenteeism.
- In September 1997, Robertson received a five-day suspension for "failure to properly line switch causing pantograph damage to engine." (Id.).
- In September 1998, Robertson received a verbal warning, again for excessive absenteeism. (Id.).
- In October 1998, Robertson received a "Written Warning" after he arrived for work more than three hours late with no explanation. (Id. Ex. D, Tab 2).
- In January 1999, Robertson received another disciplinary letter relating to the October 1998 lateness, which also noted that he had "marked off" six days in December without providing an explanation for his absence. (Id.).
- In August 1999, Robertson was once again the subject of a formal investigation for absences during that month, and agreed to accept a discipline of sixteen days' suspension. (Id.).

After this string of chronic absenteeism, there were two important developments in September 1999. First, Robertson informed Marianne Letterio, a manager in Amtrak's Occupational Health Department, that he had been prescribed "Zoloft and/or Lithium." (Id., Ex. E, Tab 12, Ex. 18). In response, Letterio wrote Robertson a letter dated September 1, 1999, in which she wrote that "because of the potential side effects of the medication, and the fact that [Robertson was] responsible for rail passenger safety," Robertson was required to submit a letter

from his physician that included (1) the clinical reason for the prescriptions as well as dose, frequency, and duration, (2) a statement that he had been observed for two weeks without significant side effects, (3) a statement that the physician was aware that Robertson was responsible for passenger safety, and (4) a statement by the physician as to whether the medications would interfere with the duties of conductor. (Id.). The letter demanded a response "within ten (15) [sic] days." (Id.). Robertson did not respond within ten or fifteen days, as explained below.

Second, Robertson failed to report to work on September 27, 1999, which triggered a series of events. (Robinson Aff. Ex. A). On October 12, 1999, Robertson's supervisor, Ernie Sarkady, sent him a letter that "confirm[ed] [their] discussion on Monday, October 11, 1999 regarding [Robertson's] recent failure to report for duty at 8:00 p.m. on Monday, September 27, 1999." (Id.). The letter continued:

> Mr. Robertson, as you are keenly aware, this was not the first time you have violated Amtrak's Operating Rules and Procedures, particularly those that mandate your dependability and responsibility as a Conductor. You have consistently violated the trust placed in you as an employee who is required to perform safety-sensitive duties and responsibilities critical to the success of our company. Although you have been given more than ample time and opportunity to correct your job performance, so far, you have failed to do so and it will no longer be tolerated.
>
> In compliance with current policy, and based upon previous and numerous counseling sessions (verbal and written) and Formal

> Investigations, you are officially being put on notice that future violations of Operating Rules and Procedures, particularly those mandating your reliability and dependability, will not only result in formal disciplinary proceedings but, if found guilty, you will be assessed discipline of termination in your employment relationship with Amtrak.
>
> Accordingly, please consider this as a FINAL WARNING to take the corrective steps necessary in improving your job performance, or you will be subject to Dismissal In All Capacities.

(Id.).

After receiving this letter, Robertson requested a leave of absence to seek treatment for his "mental health issues," and, apparently without it having been granted, simply stopped showing up for work in early November 1999. (Robertson Aff. ¶ 4 & Ex. B). On November 19, 1999, Amtrak sent Robertson another letter, directing him "to provide written medical documentation to substantiate [his] current absence, allegedly due to illness." (Id. Ex. B). After two months passed and Amtrak received nothing from Robertson, Sarkady sent him another letter on January 14, 2000, noting that Robertson had been "absent from duty without authority and [was] no where to be found." (Id. Ex. C). The letter directed Robertson to provide medical documentation to substantiate his absence by January 24, 2000. (Id.).

Finally, more than four months after he was initially directed to do so and well after the January 24 deadline, Robertson provided notes from two doctors indicating that he had been attending an outpatient drug-and-alcohol rehabilitation

program from January 21 to March 10, 2000,[2] and that he had been under the care of a psychiatrist for "depression, compliance, mood issues & alcohol & cocaine" from August to September, 1999. (Id. ¶ 7 & Ex. D).

After Amtrak received these documents, Sarkady forwarded them to Letterio and Dr. Timothy Pinsky, Amtrak's medical director, for the purpose of "ascertaining the validity of Mr. Robertson's medical documentation as they relate to justification and substantiation of his excessive absenteeism, and other behavioral problems." (Id. Ex. G). In a letter that accompanied the documentation, Sarkady expressed the opinion that Robertson was making a "last ditch effort . . . to use a medical excuse for his actions." (Id.). Sarkady continued:

> Believe me, if Mr. Robertson has medical problems, they should be given full consideration and concern. However, it appears his medical condition is coming into play after the fact, after getting caught. The bottom line is either Mr. Robertson can or cannot continue to perform service within a safety sensitive environment, where the safety of passengers and co-workers are an issue, including his own safety.
>
> I will trust that Dr. Pinsky . . . will give full and careful consideration of the entire "package" before him regarding Mr. Robertson and his employment relationship

[2] In an affidavit, Robertson avers that he provided these documents to Amtrak on February 8, 2000. (Robertson Aff. ¶ 7). It appears, however, that this is impossible, because one of the letters is dated March 22, 2000, and indicates that Robertson was receiving outpatient drug and alcohol treatment through March 10, 2000. (Id. Ex. D). Thus, the best-case scenario for Robertson is that he provided one letter on February 8, 2000 (two weeks after the January 24 deadline), and the other some time in late March 2000, two months after the deadline.

> where Amtrak is concerned. I am confident that if Dr. Pinsky considers all aspects of Mr. Robertson's "difficulties" within full context, and proper perspective, he will determine whether his situation is medical or disciplinary by nature, or a combination of both. In either case, the focus is on safety and it is the issue of paramount importance.

(Id.).

After receiving the documentation, Amtrak sent Robertson two letters dated February 15, 2000. (Hein Decl. Ex E, Tab 9). One informed Robertson that he was suspended in all capacities pending an investigation into his alleged violations of Amtrak rules and procedures. (Id.). The other informed him that he was being charged with five violations of Amtrak operating rules, including rules related to absenteeism, obeying instructions, attendance, insubordination, and proper performance of duties. (Id.). The second letter explained that since April of 1999, Robertson had been absent for 168 days of work, "inclusive of a continuous unavailability since November 3, 1999." (Id.). The letter acknowledged that Robertson had "given reason [for the absences] as sickness," but that he had "failed to substantiate same and thus used sickness as a subterfuge to avoid duty." (Id.). The letter went on to state that "[r]elative to your current absence, you have continually and willfully refused and disobeyed mandatory instructions, to supply documentation to justify and support your current absence as directed by a Company official." (Id.). The letter instructed Robertson that his formal hearing would take place on February 24, 2000. (Id.). This hearing was adjourned numerous times over

the course of four years, and was finally scheduled for March 18, 2004.[3]

In the meantime, Robertson, after not having worked for Amtrak for four years, asked to return to work in September 2003. (Def. Rule 56.1 Statement ¶ 11; Pl. Rule 56.1 Statement ¶ 11). At that time he submitted medical information indicating that over the course of the years since he had last worked he had undergone extensive treatment for bipolar disorder, alcohol dependence, and cocaine dependence; he had been sober for twenty-one months; and, in the opinion of his doctors, he was able to return to work. (Hein Decl. Ex. D, Tab 4 & Ex. G, Tab B).

Pursuant to the CBA, which provides that employees are subject to periodic examinations when the employee is physically or mentally impaired in a manner that affects the employee's job, Robertson underwent physical and psychiatric evaluations in late 2003. (Id. Ex. G, Tabs A, D). The psychiatric evaluation was performed by Dr. Azariah Eshkenazi. (Id. Tab E). Dr. Eshkenazi produced a report for Dr. Pinsky, explaining that Robertson had abused alcohol and cocaine for twenty-five years, but that he reported that he had been sober for the last two, having quit "because [he] realized that [he] was about to lose [his job]." (Id.). Dr. Eshkenazi questioned Robertson as to why he had not worked in two years if he had indeed been sober for that time,

---

[3] The record indicates that the hearing was adjourned nine separate times at the request of Robertson and/or the Union, once apparently at the request of Dr. Pinsky, and once on consent of both Amtrak and the Union. (Hein Decl. Ex. E, Tabs 10 & 11).

and Robertson responded that he had to "adjust to the idea that he had to take medication . . . for his psychiatric condition." (Id.). Dr. Eshkenazi wrote that his answer "was somewhat evasive and did not appear very sincere." (Id.). When asked why he thought he was being evaluated, Robertson responded: "Because it's personal between me and the supervisor, who wants to disqualify me on a medical basis." (Id.). The report concluded that "it is my opinion with a reasonable degree of medical certainly that from a psychiatric point of view, at this time, [Robertson] is able to return to his employment as an Assistant Conductor." (Id.).

Finally, by letter dated February 2, 2004, Amtrak notified Robertson that "Dr. Pinsky has determined that you can be cleared to return to work," on the condition that Robertson provide Dr. Pinsky "with evidence every 60 days, initiating from the date of receipt of this letter, of ongoing abstinence from drugs and alcohol over the next 12 months." (Id. Ex. G, Tab G). Robertson remained out of service, however, pending the outcome of his hearing on the excessive absences. (Def. Rule 56.1 Statement ¶ 15; Pl. Rule 56.1 Statement ¶ 15).

The hearing finally was held on March 18, 2004. (Hein Decl. Ex. E, Tab 12). Robertson was present, and represented by a Union representative. (Id.). Sarkady testified that he had been in contact with Robertson's Union representative in late 1999 and had been informed that Robertson was "out medically," but the medical reason was "unknown to [Amtrak]" and that "the

company had no idea what Mr. Robertson's status" was during that time. (Id. Ex. E, Tab 12, at 15-16). Robertson and his union representative conceded that Robertson was late in providing the requested information, but argued that simply being late did not justify a charge of insubordination. (Id. at 36-38). On April 1, 2004, the hearing officer issued a letter-decision in which he found that (1) Robertson's medical documentation supported sixty-two days of absences between January 9, 2000, and March 10, 2000, but failed to support 106 additional absences, (2) Sarkady had given Robertson "ample notice and concise directions to take corrective steps to improve [his] job performance regarding his dependability and reliability," and (3) Robertson was guilty of insubordination, although his conduct did not rise to the level of "willful disregard or failure to comply." (Id. Tab 13). On the same date, Robertson received a notice from Howard W. Carter, Jr., Amtrak's Superintendent of Operations, informing Robertson that "[u]pon reviewing the Hearing Officers [sic] findings, you are hereby terminated in all capacities as a Passenger Conductor . . . effective immediately." (Id. Tab 14).

Three months after he was discharged, in July 2004, Amtrak sent a letter to Robertson's Union representative stating that "[w]hile we are of the opinion that [Robertson's] conduct justifies the discipline assessed in this case," Amtrak was nevertheless

> agreeable to reinstate [Robertson] on a 'last chance' basis, subject to the following conditions, as full and final settlement of this case:

> 1. [Robertson] will be restored to service with full seniority rights unimpaired, but without back pay for any time lost as a result of the action taken against him;
>
> 2. [Robertson] will be required to contact Mr. Howard W. Carter, Superintendent Operations, within three (3) days from the date he signs this agreement to arrange for and satisfactorily pass a return-to-duty physical examination . . .
>
> 3. In the event [Robertson] is to be absent, he must contact a New York Division Operations Department Official to obtain permission to mark off from duty. [Robertson] may not be absent, for any reason, without the express permission of such an official. Further, absences due to illness must be supported with a note from [Robertson's] physician, attesting that [Robertson] was unable to work due to such illness, and furnished to Amtrak's Medical Director.
>
> 4. Any failure by [Robertson] to adhere to Amtrak's National System Attendance Policy or the express provisions of this agreement will be grounds for dismissal.

(Id. Tab 15).

Robertson agreed to these terms. (Id.). Robertson was then cleared to return to duty and did so on September 23, 2004. (Def. Rule 56.1 Statement ¶ 43; Pl. Rule 56.1 Statement ¶ 43). He was working as an Amtrak conductor at the time he commenced this lawsuit. (Id.).

**B. Procedural History**

Robertson commenced this action by filing a pro se complaint on August 4, 2004, and an amended complaint, this time with counsel, on October 4, 2004. The amended complaint is poorly drafted, but it appears that Robertson seeks damages, "in

an amount believed to be no less than $1,000,000.00," as compensation for damages suffered as a result of his discharge. (Am. Compl. at 8). These damages include compensation for "loss of employment, loss of past and future earnings, bonuses, deferred compensation, and other employment benefits" (id. ¶ 23), as well as "severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to . . . reputation, and other past and future pecuniary losses" (id. ¶ 31), notwithstanding the fact that he was reinstated three months after his dismissal and agreed that he was not entitled to back pay. He also seeks $5,000,000.00 in punitive damages. (Id. at 8). Amtrak filed the present motion for summary judgment on May 23, 2005.

## DISCUSSION

### A. Rule 56(f)

As a preliminary matter, Robertson opposes the motion chiefly on the ground that he "has not had the opportunity to conduct any discovery in this action" (Pl. Mem. at 6),[4] and that accordingly he is entitled to an opportunity to conduct further discovery under Federal Rule of Civil Procedure 56(f). The Court will address this argument before reaching the merits.

In opposing a motion for summary judgment on the basis

[4] References to "Pl. Mem." are to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (docket no. 16). The pages of plaintiff's memorandum were not numbered, and the Court has numbered the pages.

that further discovery is needed, a party may submit, pursuant to Rule 56(f), "an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (internal quotations and citations omitted). Relief under Rule 56(f) will be denied if the discovery sought appears to be irrelevant to the issues to be adjudicated. See Contemporary Mission, Inc. v. N.Y. Times Co., 842 F.2d 612, 622 (2d Cir. 1988). Additionally, "[e]ven where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." Nat'l Union Fire Ins. Co. v. The Stroh Cos., 265 F.3d 97, 117 (2d Cir. 2001) (internal quotations and citations omitted). Finally, "[r]equests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored." Paddington Partners v. Bouchard, 34 F.3d 1132 (2d Cir. 1994).

Here, Robertson filed his amended complaint on October 4, 2004. Amtrak answered on November 15, 2004. The Court held a pretrial conference on January 7, 2005, at which it set a discovery cut-off of June 3, 2005. On January 27, 2005, Amtrak served its Rule 26 disclosures on Robertson, including

approximately 1200 pages of documents. (Hein Reply Decl. ¶ 4). Amtrak's counsel represents that between January and March of 2005, Robertson made no discovery requests of any kind. (Id.). Plaintiff's counsel does not challenge the representation, and I accept it. On March 10, 2005, counsel for Amtrak wrote to the Court seeking permission to move for summary judgment. (Id. ¶ 5). Robertson still did not request any discovery. (Id.). On April 29, 2005, the Court held a pre-motion conference at which it granted Amtrak permission to move for summary judgment but ruled that document discovery could continue. Still Robertson did not request any discovery. (Id. ¶ 6). Amtrak finally moved for summary judgment on May 23, 2005.

Without explaining why she allowed more than four months to lapse without making a single discovery request, Robertson's counsel has submitted a declaration in which she states under penalty of perjury that Robertson has not "been afforded the opportunity to conduct any discovery in this action." (Rudich Decl. ¶ 6) (emphasis in original). This fails to satisfy the requirement of a Rule 56(f) affidavit that counsel explain what attempts have been made to obtain discovery, let alone the requirement that counsel explain why the attempts (if there indeed were any) were unsuccessful. The inability to effectively defend against a summary judgment motion because one has failed to conduct any discovery is an insufficient basis on which to defeat the motion. See, e.g., N. Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d

640, 648 (2d Cir. 2005) (upholding grant of summary judgment where plaintiff "failed to conduct discovery on the merits" and was thus "unable to dispute effectively [defendants'] statement of uncontested facts submitted in support of their motion"); Players, Inc. v. City of New York, 371 F. Supp. 2d 522, 532 (S.D.N.Y. 2005) (denying Rule 56(f) motion because plaintiff "failed to demonstrate that [plaintiff] made reasonable efforts to obtain the facts it now seeks, much less that those reasonable efforts were unsuccessful"); see also 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2740 (3d ed. 1998) (stating that Rule 56(f) "will not be liberally applied to aid parties who have been lazy or dilatory"). This alone is a sufficient basis on which to deny the request for additional discovery.

In addition, Robertson's counsel has failed to articulate with any reasonable specificity what facts plaintiff seeks to discover and how they would create a material issue of fact. In her declaration, she states that "[t]his case is rife with material factual issues that need to be explored," such as "whether [Robertson's] supervisor . . . tainted the decision-making process with discriminatory animus," and whether "illegal discrimination was a factor motivating the adverse employment action." (Rudich Decl. ¶¶ 7-8). These general assertions do not provide a basis on which to deny summary judgment. See Paddington Partners, 34 F.3d at 1139 ("A court can reject a request for discovery, even if properly and timely made through a

Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered."); see also Weeks v. N.Y. State Div. of Parole, No. 00 CV 5865 (SJ), 2002 WL 32096593, at *8 (E.D.N.Y. November 25, 2002) ("The Second Circuit has been clear . . . that where a plaintiff relies on 'bare assertions' or 'mere speculative allegations' about the validity of the underlying claim, summary judgment is appropriate despite a lack of discovery.").

Consequently, I hold that Robertson, having squandered ample opportunity in which to conduct discovery, is not entitled to delay resolution of Amtrak's summary judgment motion under Rule 56(f). I therefore proceed to consider the motion on the merits based on the record presently before the Court.

**B. The Merits**

**1. Summary Judgment Standard**

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could

return a verdict for the nonmoving party." Id. at 248; accord Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus., 475 U.S. at 586. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249-50. As the Court held in Anderson, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citations omitted).

**2. The ADA, Rehabilitation Act, NYSHRL, and NYCHRL**

**a. Applicable Law**

The ADA prohibits employment discrimination against individuals with disabilities, and provides that:

> [n]o [employer covered by the ADA] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA's definition of "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee

unless . . . [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the . . . [employer's] business." Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1514 (2d Cir. 1995) (quotation omitted).

Under the ADA, a "disability" includes (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such an impairment; or (3) a perceived impairment. 42 U.S.C. § 12102(2); Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005). Not every physical or mental impairment is considered substantially limiting; "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002). The existence of a disability is to be determined on a case-by-case basis. Id. at 185.

In the context of drug and alcohol addiction, the ADA specifically provides that the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, or whose current use of alcohol prevents the individual from performing the duties of the job in question. 29 U.S.C. §§ 705(20)(C)(i) & 705(20)(C)(v). It also provides, however, that the exclusion for current drug users does not extend to an individual who has successfully completed,

or is in the process of completing, "a supervised drug rehabilitation program and [who] is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use." 29 U.S.C. §§ 705(20)(C)(ii)(I) & 705(20)(C)(ii)(II). "The import of these provisions . . . is that drug addiction, like alcoholism, is recognized as a disease that can be disabling, but that current drug use disqualifies a person from protection under [the ADA]." Gilmore v. Univ. of Rochester Strong Mem'l Hosp. Div., 384 F. Supp. 2d 602, 611 (W.D.N.Y. 2005) (citing Reg'l Econ. Cmty. Action Progam, Inc. v. City of Middletown, 294 F.3d 35, 46 (2d Cir. 2002)).

To establish his claim of discrimination under the ADA, Robertson must show that (1) Amtrak is covered by the ADA; (2) he suffers from a disability, or is regarded as suffering from one, within the meaning of the ADA; (3) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. See Capobianco, 422 F.3d at 56 (citations omitted).

For the most part, disability claims brought pursuant to the Rehabilitation Act, the NYSHRL, and the NYCHRL are construed similarly to ADA claims. Although the definition of disability under the NYSHRL is broader than the federal definition, Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 155 (2d Cir. 1998); see also State Div. of Human Rights

v. Xerox Corp., 65 N.Y.2d 213, 218-19 (1985), the NYSHRL is substantially similar to the ADA, providing, in pertinent part:

> It shall be unlawful discriminatory practice: (a) for an employer . . . because of the . . . disability . . . of an individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.

N.Y. Exec. Law § 296 (McKinney 1993); see also Mohamed v. Marriott Int'l, Inc., 905 F. Supp. 141, 156 (S.D.N.Y. 1995). The Rehabilitation Act and NYCHRL are also substantially similar to the NYSHRL and the ADA. Thus, I will consider these claims together. See Mohamed, 905 F. Supp. at 156; see also Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").

**b. Application**

For purposes of this motion, I assume that Robertson has presented sufficient evidence from which a reasonable jury could find that the first two elements of an ADA claim have been met: that Amtrak is a covered employer, and that Robertson is a person with a disability within the meaning of the ADA.[5] I

[5] Although I make this assumption for purposes of this decision, I note that it is far from clear that Robertson was disabled within the meaning of the ADA, because it appears from the record that Robertson was a current drug user at the time of his actions that gave rise to the charges of insubordination and chronic absenteeism. For example, one of the physician letters that Robertson submitted when he sought to be rehired in late 2003 indicated that Robertson had been sober for twenty-one months as of September 9, 2003. (Hein Decl. Ex. D, Tab 4). Similarly, the report of Dr. Eshkenazi indicated that Robertson had been sober for two years as of December 16, 2003. (Id. Ex.

further assume that Robertson was qualified, with or without a reasonable accommodation, to perform the essential functions of his job, thereby satisfying the third prong of an ADA claim.[6] Ultimately, however, summary judgment must be granted for Amtrak because Robertson has not demonstrated the existence of a genuine issue of material fact as to the fourth element: he has not presented sufficient evidence from which a reasonable jury could find that he was discharged or otherwise treated adversely[7]

---

G, Tab E). At most, then, Robertson had been sober only since the end of 2001, or approximately two years after he stopped showing up for work at the end of 1999.

[6] Again, although I make this assumption for purposes of this motion, I once again note that it is far from clear that Robertson was qualified to perform the essential functions of his job, due to his excessive absenteeism. "Under the ADA, an employee's absenteeism may be a permissible motive for an adverse employment decision where it interferes with the employee's ability to perform the essential functions of the job." Morris v. City of New York, 153 F. Supp. 2d 494, 502 (S.D.N.Y. 2001) (Chin, J.). Absenteeism, however, may be a pretext where the employer has notice that the absences were related to a disability. Id. If, as it appears, at least some of Robertson's absences were the result of his drug and alcohol use, Amtrak was entirely justified in dismissing him on that basis alone, as "an employee who is excessively absent is not performing the essential functions of his job." Id.

[7] It is unclear from the papers exactly what adverse employment action Robertson is challenging. He was rehired by Amtrak to his old position, so he cannot be making a claim for reinstatement. Although he asserts a claim in the amended complaint for loss of past earnings, this claim appears to be foreclosed by the last-chance agreement that he signed, which by its terms was a "full and final" settlement that precluded recovery for back pay. It appears, then, that he seeks compensation for the non-economic harm, such as pain and suffering, and economic harm, such as loss of benefits or attorneys' fees, that he suffered as a result of either the decision to suspend him pending the hearing or the decision to discharge him in 2004. Regardless of the precise contours of the claim, Robertson has not presented sufficient evidence from which a reasonable jury could find that he suffered any adverse

because of his disability. See Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (listing elements of ADA claim); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (explaining that to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but to produce sufficient evidence to support a rational jury verdict in plaintiff's favor).

Robertson's principal "evidence" in support of his argument that he was fired because of his disability is his claim that Sarkady, his supervisor, had personal animus toward him because of his disability. In his brief in opposition to summary judgment, Robertson writes:

> Here, on September 1, 1999, Plaintiff advised Amtrak's medical department that he was taking medication which would require FMLA. And, on November 19, 1999 Defendant corresponded with Plaintiff, fully aware of his medical condition. Plaintiff's supervisor went to medical and provided Medical with Plaintiff's disciplinary record, obviously intending to color their actions. Thus, it is clear that these allegations are sufficient to satisfy Mr. Robertson's burden of claiming that his disability was a motivating factor in the adverse employment action that Amtrak took against him and Defendant's motion should be denied.

(Pl. Mem. at 10). In addition, Robertson contends in an affidavit that Sarkady made "numerous statements displaying his discrimination," including statements that Robertson was "dodging the bullet," that he was performing in a "diminished mental state," and that he was using his medical condition as an

---

employment action because of his disability, as discussed above.

"excuse" for his actions, all in an attempt to influence the opinion of Dr. Pinsky, Amtrak's medical director. (Robertson Aff. ¶ 10).

Assuming for the moment that this exceedingly thin evidence is enough to allow a reasonable jury to find that Sarkady indeed harbored personal animus toward Robertson because of his disability, Robertson's claim still fails because a reasonable jury could only find that Robertson was dismissed not because of anything Sarkady might have said to the medical department, but only as a result of the hearing officer's determination that Robertson was guilty of the charges against him.

In this regard, Robertson apparently disputes the determination of the hearing officer that his medical documentation did not cover 106 days of absences, writing in a footnote in his affidavit that his submissions to Amtrak documented all of his absences. (Robertson Aff. at 4 n.2). First, the record belies this assertion, because Robertson's medical documentation indicates only that he was under the care of a psychiatrist from August to October of 1999, and that he was a patient in an outpatient program from January 21 to March 10 of 2000. (Id. at Ex. D). Assuming that he medically was unable to work during any of this time that he was under treatment, Robertson still, after four years and after having recovered to the point that he has returned to work, has not provided any documentation to explain his absences during all of November and

December of 1999 and most of January 2000 -- a period of nearly three months of continuous unexplained absence from work. Nor has he explained the years of intermittent absences that preceded August 1999. Second, even if the hearing officer were mistaken and Robertson's medical documentation did cover every single one of his many absences, his claim would still fail because he has presented no evidence from which a reasonable jury could find that the hearing officer's mistake -- or Amtrak's reliance thereon -- was the result of illegal discrimination.[8] See Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief . . . , what is significant is that they based their decision to dismiss on that belief, and not on [plaintiff's] age, gender, or pension status.").

In sum, the record overwhelmingly demonstrates, and a reasonable jury could only find, the following: Robertson was repeatedly absent without explanation; he was using drugs and alcohol leading up to and during the time of his absences; he

[8] Amtrak has submitted an affidavit from Harry Rogers, the hearing officer at Robertson's hearing. (Hein Decl. Ex. F). Rogers avers that his duties include "conducting formal hearings to ensure fair, consistent and impartial treatment of Amtrak employees suspected of violating Amtrak's rules, regulations, policies and/or procedures," and that he is "not affiliated with any geographic Amtrak division or business unit [and] independent of and . . . not accountable to any management personnel in any of Amtrak's respective divisions or business units, other than Amtrak's corporate law department." (Id. ¶¶ 1-2). Rogers states that "[a]t no time before I rendered my decision . . . was I ever made aware of information suggesting that Mr. Robertson may have made complaints about discrimination in the workplace." (Id. ¶ 7). Robertson has not objected to the Rogers affidavit, nor has he submitted anything to contradict it.

ignored repeated requests from his employer to provide explanation for all of his hundreds of absences; he was dismissed only after a hearing at which he was represented by his union and a neutral officer found that the charges of insubordination and excessive absenteeism were valid;[9] and, three months after his discharge, he was rehired, as Amtrak gave him yet another chance. Under these indisputable facts, no reasonable jury could find that Robertson suffered any adverse employment action "because of" his alleged disability, as required for recovery under the ADA. In fact, a reasonable jury could only find that Amtrak bent over backwards to assure that Robertson had adequate opportunities to explain his bizarre behavior, and it only drew the line after he stopped showing up for work without even trying to provide an explanation. Accordingly, Amtrak's motion for summary judgment is granted as to Robertson's disability claims.

**3. The FMLA**

The FMLA grants employees two distinct rights. First,

---

[9] The Supreme Court has made clear that in employment discrimination matters that have previously been resolved in arbitrations, "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 (1974). As a result, district courts routinely give weight to arbitration proceedings in employment discrimination matters. See, e.g., Weeks, 2002 WL 32096593, at *7; Brinson v. N.Y.C. Transit Auth., 60 F. Supp. 2d 23, 30 (E.D.N.Y. 1999); Anatsui v. Food Emporium, No. 99 Civ. 1337, 2000 WL 1239068, at *7 n.2 (S.D.N.Y. Sept. 1, 2000) ("While this arbitration award is not dispositive, it is entitled to some weight given the procedural fairness of the proceeding and the reasoned decision of the arbitrator.").

it "generally requires covered employers to grant employees who have worked for twelve months (or 1250 hours in twelve months) up to twelve weeks' leave during any twelve month period for, inter alia, a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Hale v. Mann, 219 F.3d 61, 68 (2d Cir. 2000) (quoting 29 U.S.C. § 2612(a)(1)(D)). Second, it "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA." Id. (citing 29 U.S.C. § 2614(a)(1)). To prove interference with either of these rights, a plaintiff must establish five elements: "(1) that [he] is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that [he] was entitled to leave under the FMLA; (4) that [he] gave notice to the defendant of [his] intention to take leave and (5) that [he] was denied benefits to which [he] was entitled under FMLA." Geramanos v. Columbia Univ., 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004) (citation omitted).

It is unclear whether Robertson asserts a claim for interference with FMLA rights or a claim for wrongful retaliation, because his amended complaint asserts that "in September 2003, the defendant terminated the plaintiff's employment in violation of the FMLA," but his brief in opposition to summary judgment argues that he has made out an interference claim because Amtrak "was aware that he was requesting FMLA leave when he in [sic] October 1999," and that he provided Amtrak with

the relevant medical documentation before he was suspended and charged with excessive absenteeism. (Am. Compl. ¶ 22; Pl. Mem. at 8). In either case, Robertson has failed to establish the elements of a FMLA claim.

To the extent Robertson claims interference with his FMLA rights when he initially stopped working in late 1999, his affidavit baldly asserts that he requested a leave of absence, without explaining when, how, or to whom the request was made, and without providing a copy of the request, if it was made in writing. (Robertson Aff. ¶ 4). Even assuming that this request was enough to fulfill the notice requirement for a FMLA leave of absence, Amtrak was permitted to request medical documentation to support Robertson's request for FMLA leave. See 29 U.S.C. § 2613 (explaining that "[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee" and listing basic requirements of such certification); see also Geromanos, 322 F. Supp. 2d at 420 (finding no FMLA violation where defendant required alcoholic plaintiff to submit medical documentation to assure compliance with terms of leave of absence). As explained above, a reasonable jury could only find that Amtrak made repeated requests for such documentation, which Robertson only partially supplied four months after he stopped working.

To the extent Robertson claims he was dismissed in 2004 in retaliation for taking FMLA leave, Robertson has presented no evidence from which a jury could find that his discharge was

retaliatory. As explained above, the record overwhelmingly supports the conclusion that Robertson was discharged after a neutral hearing officer found that Robertson's failure to provide medical documentation to substantiate his months of absences satisfied the charges of insubordination against him. See Geromanos, 322 F. Supp. 2d at 429 (explaining that although the FMLA prohibits employers from considering a medical leave as a negative factor in an employer's decision to discharge or demote an employee, it is "not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.") (citation omitted). Moreover, though not dispositive, Robertson's claim of retaliation is significantly undercut by the undisputed fact that Amtrak re-hired him to his old position shortly after dismissing him for insubordination, agreeing to give him yet another chance based on his representations that he had been sober for two years and had been successfully treated for his health issues and alcohol and drug dependence.[10]

Accordingly, summary judgment is granted for Amtrak on Robertson's FMLA claim.

[10] A fair argument can be made by Amtrak that the last-chance agreement bars some or all of Robertson's claims in this case. I do not reach this issue.

## CONCLUSION

For the foregoing reasons, Amtrak's motion for summary judgment is granted, and the amended complaint is dismissed in all respects, with costs but without attorneys' fees. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: New York, New York
November 30, 2005

DENNY CHIN
United States District Judge